Filed 3/18/13  P. v. Pineda CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CARLOS PINEDA,<br><br>        Defendant and Appellant. | B231037<br><br>(Los Angeles County<br>Super. Ct. No. KA088612)<br><br> ORDER MODIFYING OPINION<br> AND DENYING REHEARING<br> [NO CHANGE IN JUDGMENT]<br>                    . |

THE COURT:

It is ordered that the opinion filed herein on February 15, 2013, be modified as follows:

1.  On page 2, first paragraph, third line, delete "12022.53,".

2.  On page 2, fourth paragraph, fourth and fifth lines, delete "his forehead" and substitute "the front of his head above the hairline".

3.  On page 2, fifth paragraph, first line, delete "back".

4.  On page 4, last paragraph, second line, delete "this tattoo is very large" and substitute "a photograph shows this tattoo is very large".

5.  On page 6, second line, delete "his forehead" and substitute "the front of his head above the hairline".

6.  On page 7, second line, delete "called her cell phone at least three times, but she never spoke to him" and substitute "telephoned her at least three times."

7. On page 22, footnote 8, sixth line, delete "his forehead" and substitute "the front of his head".

8. On page 22, first full paragraph, seventh line, delete "and he was ejected".

9. On page 27, first paragraph, fourth and fifth lines, delete "As Pineda acknowledges, the missing definition" and substitute "The missing definition".

10. On page 32, delete the subheading and the following paragraph, and substitute:

"b. *Upper term on count 3 firearm enhancement was properly imposed.*

Pineda contends that, by imposing an upper term on the count 3 firearm use enhancement, the trial court violated *Cunningham v. California* (2007) 549 U.S. 270 (127 S.Ct. 856). This claim is meritless."

11. On page 33, first full paragraph, first line, before "contention" insert the word "apparent".

12. On page 33, after the first full paragraph, add the following new paragraph:

"Pineda contends the trial court abused its discretion because imposing an upper term on the firearm enhancement in addition to an upper term on the substantive offense, which was itself doubled under the Three Strikes law, amounted to a sentence that was beyond the bounds of reason. But Pineda offers no relevant case authority or reasoned argument showing why this conclusion is justified."

13. On page 36, delete the final sentence of the first full paragraph and insert the following in its place: "The court also made an apparent reference to the fact that just a few weeks before committing the shootings, Pineda had been granted probation after pleading guilty to a felony arising out of the Dodger Stadium incident. The trial court did not abuse its discretion by imposing a consecutive term on count 4."

There is no change in judgment.

Appellant's petition for rehearing is denied.

2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARLOS PINEDA,<br><br>    Defendant and Appellant. | B231037<br><br>(Los Angeles County<br>Super. Ct. No. KA088612) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed as modified.

William L. Heyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels, Michael C. Keller and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Carlos Pineda, appeals his conviction for assault with a semiautomatic firearm (2 counts) with enhancements for firearm use, great bodily injury and a prior serious felony conviction (Pen. Code, §§ 245, subd. (b), 12022.53, 12022.5, 12022.7, 667, subds. (a)-(i)).[1] He was sentenced to state prison for a term of 44 years 4 months.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

    a. *The shootings at the bar.*

On the night of October 17, 2009, defendant Pineda was at the Around the Corner Bar and Grill in West Covina with a small group of people, which included Leo Velasco and Angel Palencia. Pineda was wearing an Oakland Raiders football jersey. He had prominent gang tattoos on his face, his neck and the back of his shaved head. On his forehead he had a tattoo that said, "Fuck Cops."

Just before the bar closed, Pineda and his friends walked out the back door and sat down on a nearby bench. Isaiah Santoya, the bar's doorman and bouncer, noticed Pineda had walked outside with a drink in his hand. Santoya asked Pineda to bring the drink back inside, which was in accord with bar policy that all drinks were to be consumed on the premises. Pineda initially refused and an argument between the two of them ensued.

Santoya testified Pineda "and his friends . . . came closer towards me aggressively. . . . I stood my ground, just told them that I needed the drinks back inside and he wasn't going to be allowed back inside the bar." "[A]s things were escalating, these guys were starting to surround me. You know, it's getting tense. It's getting serious. . . . [T]he only thing I was worried about was . . . catching a beating. It's three

---

[1]    All further references are to the Penal Code unless otherwise specified.

to one." Pineda patted his pants pocket and said something about having a gun.**2** The women in Pineda's group told Santoya he had "fucked up" and "didn't know what [he] was getting [himself] into." Pineda and Santoya continued arguing for a few minutes, and then Pineda's group walked away. Santoya followed them for a short distance, but then turned around and walked back toward the bar.

When it appeared the argument between Pineda and Santoya was not winding down, Velasco turned around and started walking to his car.

Filipo Nafanua, a regular customer at the bar, saw Santoya and Pineda arguing about the drink. Then Nafanua saw Pineda walk away and disappear around a corner. But Pineda reappeared with a gun and started shooting. Nafanua heard two gunshots and he was hit in the right knee.

Santoya testified he was still walking back toward the bar when he heard several gunshots go off behind him. He ran into an alley and hid in a dumpster until he heard sirens. Then he realized he had been shot in the leg.

Velasco testified he heard gunshots while walking to his car. He got scared and started to run away. As he did, he heard Pineda and Palencia call out to him: "Leo, Leo, stop. Get in the car and let's leave." Pineda and Palencia were standing near Velasco's car and demanding his car keys, saying: "Get the keys, mother fucker." When Velasco refused, Palencia yelled: "If he's not coming back, shoot him." Velasco kept running, jumped a fence and hid in some bushes.

A week or so after the incident, Velasco received a telephone call from Palencia, who said: "Thanks to you, we are on the run." Palencia warned Velasco to stay away from the police. Some time later, Velasco ran into Pineda's twin brother, Mauricio, who warned him not to testify against Pineda.**3**

---

**2**     Velasco testified Pineda said, "It seemed that the man [i.e., Santoya] wanted to see the strap." Velasco testified "strap" was a reference to a pistol.

**3**     Velasco testified Mauricio "started telling me not to come to the court, that it was not necessary; that I was not involved in this and to try . . . not to testify against [Pineda]." Mauricio said, "they didn't want . . . nothing bad happening to me."

b. *In the aftermath of the shooting.*

Santoya was treated by Dr. Edmund Nichter at Queen of the Valley Medical Center. Nichter testified Santoya's gunshot wound was relatively superficial: "[T]he bullet grazed the skin, causing [an] abrasion and then it lodged just subcutaneously in the right thigh. So I made an incision [using a local anesthetic] . . . and extracted the bullet with minimal difficulty." Nichter then closed the wound with three sutures. Asked if Santoya's injury were serious, Nichter testified: "Any time a patient presents with a gunshot wound, it's serious. Now, it is . . . in the lower extremity, it's obviously less serious than it would be if it was in the abdomen or the chest."

Nafanua told police the gunman was a Hispanic man, 19 to 21 years old, who was wearing a black Oakland Raiders football jersey with the number 34 on it, and who had a large tattoo on the front of his neck and a "626" tattoo on the back of his head. When police searched Pineda's house, they found a black Raiders jersey with the number 34. Shown a six-pack photo array, Nafanua said two of the men looked similar to the gunman; one of the two was Pineda.

Police found four .25 caliber bullet casings at the shooting scene, but the gun was never recovered. Tracy Peck, a firearms examiner, testified a semiautomatic pistol used a magazine, fired one bullet with each pull of the trigger, would shoot as fast as the trigger could be pulled, and automatically ejected the used cartridge cases. The four ".25 auto caliber cartridge case[s]" found at the shooting scene had all been fired from the same weapon, and the bullet removed from Santoya's leg was "consistent with bullets commonly loaded in .25 auto caliber cartridges." Peck opined the weapon that fired the bullet and the four cartridge cases was "[m]ost likely" a semiautomatic pistol.

Officer Avila testified he has known Pineda and his twin brother, Mauricio, for about 10 years. Pineda has "Azusa" tattooed on his neck; this tattoo is very large and covers virtually the entire front of Pineda's neck. "[O]n the top of his head, above his hairline, he has the statement of 'Fuck Cops.' He has also double horns on his head. He has an 'A' tattooed on his left eye . . . area and a teardrop on his right . . . side . . . [s]ame area, right below his eye."

4

While Pineda was in jail on this case, he made some telephone calls which could be interpreted as asking various people to contact prosecution witnesses.

c. *Prior incident at Dodger Stadium.*

On September 2, 2009, six weeks before the bar shooting, Pineda was involved in an altercation at Dodger Stadium. Mark Hubert, an off-duty police officer, was working as a security guard at the stadium. It came to his attention that Pineda had been "using profanity, and flipping off people in the stand[s] using his middle finger." Hubert went up into the stands, saw Pineda sitting with a group of eight men, and asked him to come downstairs. Hubert told Pineda he was being ejected from the ballpark because of his bad behavior. Pineda replied, "If I'm going to go, I'm going to go for something good." He removed his shirt and took a fighting stance with his fists raised. Hubert handcuffed him. Hubert testified Pineda "proceeded to tell me what a bad ass he was and how he had been arrested several times. And he had seen me around there several times. He referred to me as white boy. Yeah, I've seen you here, white boy. I'm going to come get you. You see who I hang out with up there. We're going to come get your ass. You're not safe."

"Q. And, when . . . he said something about you see who I'm with up there, did he point up in the stands where he had previously been sitting?

"A. Yeah. He gestured up toward the stands. We were outside the stadium . . . ."

As a result of Pineda's threat, Hubert began carrying a weapon to his Dodger Stadium job.

d. *Gang evidence.*

Azusa Police Officer Rocky Wenrick worked in the gang unit and was familiar with Pineda's family. Pineda, whose gang moniker was Raider, belonged to the Barrio Azusa 13 gang. Wenrick had known Pineda and his brother, Mauricio, for about six years. In general, a member of the Barrio Azusa 13 gang would have the following body tattoos: "The name 'Azusa,' an 'A,' a '13,' 'SUV,' 'Canyon City.' " Wenrick also described Pineda's tattoos: He "has 'Azusa' on the front of his neck. On his chest it says 'Azusa.' On the back of his head, he has 'SUV 626.' . . . I believe he has an 'A' on the

top of his head and the Roman numeral X and 3 [representing 13]." Pineda also had a "Fuck Cops" tattoo on his forehead.

One way to gain status within the gang is to stand up to authority figures: "It just shows they are not a coward [*sic*]. They're not going to back down when they're questioned or called upon. When someone calls them out, they're not going to back down, or they're disrespected. They're going to step up and handle their business." Wenrick knew about the Dodger Stadium incident and he had an opinion about why Pineda had threatened Hubert:

"Based on the number of people that are in the stands and watching the game, he can't be belittled or disrespected. I'm sure he felt like I'm being disrespected by this security guard. So . . . to let him know, he shows tattoos. He advises of his gang membership and then he makes the threats of his past criminal activity. 'You don't know who I am' is . . . done to show that he's not going to back down and to intimidate the security guard and hoping he'll back down just based on he's a gang member. He's threatening. He's done other crimes in the past. And it's done to intimidate and hopefully get the security guard to back down. [¶] . . . [¶]

"Q. And, in a situation in which that security guard confronted Mr. Pineda about a glass being taken out of a bar, would that also have any affect [*sic*] on how Mr. Pineda would react when confronted by that security guard?

"A. That would be very similar to the stadium. He feels he's being disrespected by the security guard just doing his job so he's got to elevate the situation and let him know, hey, this is who I am. Do you know who you're messing with? That type of situation."

2. *Defense evidence.*

Jessica Esparza had known Pineda for more than five years, and she knew Velasco through Pineda. After the bar shooting, Velasco came to Esparza's house to ask how Pineda was doing. Velasco also telephoned her several times. Velasco never said Pineda's brother had threatened him.

6

Pineda's mother testified she had seen Velasco outside her house several times. He called her cell phone at least three times, but she never spoke to him.

## CONTENTIONS

1. The trial court erred by denying Pineda's mistrial motion for jury misconduct.

2. There was insufficient evidence to sustain the assault convictions and the great bodily injury enhancement as to Santoya.

3. The trial court improperly admitted evidence about the Dodger Stadium incident and Pineda's gang affiliation.

4. The trial court failed to properly instruct the jury on the definition of "semiautomatic firearm."

5. Penal Code section 245, subdivision (b) (assault with a semiautomatic firearm) violates equal protection.

6. There was cumulative error.

7. The trial court made a series of sentencing errors:

    a. The trial court improperly imposed upper terms for count 3 and the attached firearm use enhancement.

    b. The trial court improperly imposed a firearm use enhancement on count 4.

    c. The trial court improperly imposed a full-term consecutive enhancement for the great bodily injury enhancement on count 4.

    d. The trial court improperly imposed a consecutive term on count 4.

    e. The sentence on count 3 constituted cruel and unusual punishment.

## DISCUSSION

1. *Juror misconduct did not warrant a mistrial.*

Pineda contends the trial court erred by denying his motion for a mistrial based on jury misconduct. This claim is meritless.

    a. *Background*.

During deliberations, the jury sent out a note which the trial court subsequently read in the jury's presence:

"The Court: [¶] . . . [¶] . . . I'll read it verbatim as written. It states, 'We just would like to note, came up in conversation defendant's family looked at jury panel, possible gesture directly at the jury. We are not threatened, but just wanted it to go on the record. A few of us live within the vicinity.' And this is ostensibly prepared by Juror No. 12, who I am assuming is the foreperson?"

After the court confirmed Juror No. 12 was indeed the foreperson, the following colloquy occurred:

"The Court: [¶] . . . [¶] The communication indicates that this issue came up during conversation. Do you mean that it came up during deliberations or during conversation outside of deliberations?

"The Foreperson: During deliberations.

"The Court: And was this brought to the deliberating jury's attention by just one juror or more than one juror?

"The Foreperson: It was one juror.

"The Court: And after the subject was brought to the attention of the remaining deliberating jurors, was it discussed at that point?

"The Foreperson: Yes.

"The Court: And once it was discussed during deliberations, obviously it concerned you, or perhaps more members of the jury, enough to where you had to alert the court that it was an issue; correct?

"The Foreperson: Yes.

"The Court: Now, despite the subject being discussed during deliberations, do you feel that it's had an impact on you, or perhaps anyone else, with respect to their ability to focus simply on the evidence in this case and to remain fair and impartial?

"The Foreperson: No, it has not been a concern.

"The Court: Which [the] communication somewhat addresses, it says, 'We are not threatened by it,' in other words not affected by it. Now I need to admonish the jury that it's critical that your deliberations focus only on the evidence presented in this courtroom, and like the instructions have already mentioned from the start, your decision must be

8

based solely upon the evidence and not by any other source, in other words, information outside the evidence, whether or not it occurred in the courtroom or outside the courtroom, none of that is evidence.  It shouldn't have even been addressed during deliberations, it should have been kept separate and apart from deliberations because it's not evidence . . . .  [¶]  So Juror No. 12, do you feel that this jury can continue deliberations and focus simply on the evidence that has been presented?"

After Juror No. 12 responded "yes," the trial court asked all the other jurors individually if they felt the same or differently, and each juror agreed that what happened would not interfere with deliberations.

Then, outside the jury's presence, the trial court told counsel it had "decided not to inquire as to the details of the gesture that was made and who made it, that type of thing, because my fear is that it highlights the issue once again and kind of makes it a subject for the jury to at least think about it despite my admonition not to consider it.  I'm reluctant to go into the details since I've told them now whatever it was they cannot consider it at all, and they seem to be all in agreement.  So was my inquiry adequately [*sic*] based upon my concerns?"  Defense counsel said, "I think so," but then made a mistrial motion "for the record . . . since it was brought up in the deliberation room and everybody discussed it."  Defense counsel added, "I don't think further – unless the court thinks further inquiry would be needed to address that motion made by me."  The prosecutor said, " . . . I'm going to agree with the court.  I don't think we need to inquire further for the reasons that the court has indicated, but perhaps at the conclusion, whenever we do release this jury, just to determine whether or not there was something that we should consider as far as tampering with [the] jury and intimidation of the jury, but not at this point.  [¶]  The Court:  Okay, thank you.  I'll permit the jurors to continue their deliberations . . . ."

While the jury continued to deliberate, defense counsel argued for a mistrial based on jury misconduct because "it was apparently discussed by the group or at least in front of the group, and so it's . . . extrinsic evidence, if you will, that they're not permitted to consider, and it may now have an impact on their decision."  The trial court denied the

9

motion, agreeing the jury should not have discussed the incident during deliberations, but saying all the jurors appeared to understand they could not consider the conduct of Pineda's family "for any reason whatsoever."

        b. *Legal principles.*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) "Any presumption of prejudice [arising from juror misconduct] is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. [Citations.]" (*Id.* at p. 296.)

"  'A sitting juror's involuntary exposure to events outside the trial evidence, even if not "misconduct" in the pejorative sense, may require . . . examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation. [Citations.]' [Citation.] '[T]ampering contact or communication with a sitting juror[ ] usually raises a rebuttable "presumption" of prejudice. [Citations.]' [Citation.] 'Still, whether an individual verdict must be overturned for jury misconduct or irregularity " ' "is resolved by reference to the substantial likelihood test, an objective standard." ' " [Citation.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant. [Citations.]' [Citation.] We independently determine whether there was such a reasonable probability of prejudice. [Citation.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1303-1304.)

10

c. *Discussion.*

Pineda argues, "There was jury misconduct, even if not in the pejorative sense, in that the jury was exposed to events outside the trial evidence, namely, an attempt by appellant's family to tamper with the jury . . . . That presumption was not rebutted." "[T]he very fact that the foreperson stated in effect that several of the jurors lived in the vicinity showed that the jurors actually did feel threatened by appellant's family's looks and gesture. Given all of the emphasis in the trial [on] appellant's gang membership and related matters . . . , the jury must have been concerned that appellant's family were also gang members and were violent, and at least one of the jurors must have been influenced by this in his or her vote contributing to the verdict, to appellant's detriment. Therefore, the presumption of prejudice was not rebutted . . . ."

We disagree. The jury did not report any written or verbal communication with the assumed family members, let alone any actual written or verbal threats. The reported conduct consisted of an ambiguous gesture which did not scare the jurors, according to their note to the trial court, which said: "We just would like to note, came up in conversation defendant's family looked at jury panel, possible gesture directly at the jury. We are not threatened, but just wanted it to go on the record. A few of us live within the vicinity."

In *People v. Panah* (2005) 35 Cal.4th 395, "[i]t appears from the record that some supporters of defendant were following or 'shadowing' the jurors during breaks in their deliberations, while others, including [defendant's] mother, were clustering near the jury while it was assembling on breaks. Against this backdrop, the trial court reported a juror had told the bailiff she felt intimidated by the presence of defendant's supporters, particularly his mother. The bailiff noted that he had also overheard a male juror express relief that the jury no longer had to assemble 'on the sixth floor,' presumably to avoid contact with defendant's supporters." (*Id*. at p. 480.) Based on these facts, *Panah* held the defendant's claim of juror bias was meritless: "There is no evidence the jury was biased against defendant, his mother, or his supporters, much less that such bias infected its deliberations. What the record seems to indicate is spectator misconduct on the part of

11

defendant's supporters who, intentionally or not, made themselves conspicuous to the jurors in a manner that some of the jurors interpreted as intimidating. The jurors' understandable concern does not amount to misconduct, and there is nothing on the record to support defendant's claim that he was denied an impartial jury." (*Ibid*.)

The facts here were even less alarming than in *Panah*. Pineda has failed to prove by a demonstrable reality that one of the jurors was actually biased against him.

We also note our Supreme Court has said, in dictum: "At the outset, we question whether a convicted person can ever overturn the verdict on grounds that persons *acting in his behalf* deliberately sought to influence the jury. Certainly no such claim could ever be valid where the *accused himself* had instigated the incident; a party cannot profit by his or her own wrongdoing. But even where, as here, there is no evidence petitioner was directly involved,[4] recognition of such a claim suggests tempting opportunities for accuseds' allies to manufacture challenges against subsequent convictions." (*In re Hamilton* (1999) 20 Cal.4th 273, 305, fn. omitted.)

We conclude the trial court did not err by refusing to declare a mistrial based on Pineda's claim of juror misconduct.

2. *There was sufficient evidence to support Pineda's convictions for assault with a semiautomatic firearm and the accompanying great bodily injury enhancement as to Santoya.*

Pineda contends there was insufficient evidence to sustain his convictions for assaulting Santoya and Nafanua, as well as the great bodily injury enhancement finding as to Santoya. These claims are meritless.

a. *Legal principles.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of

---

**4**    In *Hamilton*, a juror saw the defendant's sister and her boyfriend parked in an alley behind the juror's home, and they sped off when they noticed the juror looking at them.

solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  The federal standard of review is to the same effect:  Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  [Citation.]  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.]  ‘ “Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant’s guilt beyond a reasonable doubt.  ‘ “If the circumstances reasonably justify the trier of fact’s findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.” ’  [Citations.]” ’  [Citation.]”  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

The reviewing court is to presume the existence of every fact the trier of fact could reasonably deduce from the evidence.  (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.)  Even if the reviewing court believes the circumstantial evidence might be reasonably reconciled with the defendant’s innocence, this alone does not warrant interference with the trier of fact’s verdict.  (*People v. Towler* (1982) 31 Cal.3d 105, 118.)  It does not matter that contrary inferences could have been reasonably derived from the evidence.  As our Supreme Court said in *People v. Rodriguez, supra,* 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn:  “The [Court of Appeal] majority’s reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected.  The Attorney General’s inferences from the evidence were *no more inherently speculative* than the majority’s; consequently,

13

the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

   b. *There was sufficient evidence Pineda was the gunman.*

  Pineda contends there was insufficient evidence to show he was the person who shot Nafanua and Santoya. This claim is meritless.

  Santoya, who did not see the gunman, testified the man he had been arguing with outside the bar was wearing a Raiders football jersey, had a "626" tattoo on the back of his head, and had other tattoos on his face. A photograph of Pineda confirms he had these tattoos. Velasco, who was acquainted with Pineda, testified it was Pineda who argued with Santoya that night. Velasco testified Pineda tapped his pants pocket and said something which referred to the gun he was carrying. Velasco also testified that, after he refused to drive Pineda and Palencia away from the shooting scene, he heard Palencia yell to Pineda: "If he's not coming back, shoot him." This was additional circumstantial evidence showing Pineda had the gun. Finally, Nafanua testified he saw Pineda fire the gun.

  Pineda argues there were "huge problems" with Nafanua's identification of him as the gunman. Not so. Almost all of Pineda's points are merely disguised jury argument: E.g., there was a dispute as to how many shots had been fired;[5] Nafanua would have had a hard time identifying anyone because it was 1:30 a.m. and the gunman was 50 feet away; Nafanua would have been looking at the weapon, not the gunman's face; and, Nafanua could have mistaken Palencia or Mauricio for Pineda because they both looked like him. None of these is reason for overturning the jury's verdict.

  Pineda argues Nafanua acknowledged having testified at the preliminary hearing that he did not know who fired the shots, he never saw anyone with a gun, and his memory was fresher at the time of the preliminary hearing than it was at the time of trial. But Pineda is ignoring the fact that, while some of Nafanua's preliminary hearing

---

[5] Nafanua testified he only heard two shots, while Velasco testified there were about three to five shots, and Santoya testified he heard "several" shots.

testimony was contradictory, he did testify he could identify the gunman and that it was the same person who had been arguing with Santoya.[6] Nafanua also testified his memory was even fresher on the night of the shooting, when he identified Pineda to the police, than it had been at the time of the preliminary hearing. Pineda's assertion that Nafanua's identification of him was inherently improbable and not credible is meritless.

There was more than sufficient evidence to prove Pineda had been the gunman.

      c. *There was sufficient evidence the weapon used was a semiautomatic.*

Pineda contends that, even if the evidence proved he had been the gunman, there was insufficient evidence to prove he used a semiautomatic weapon. This claim is meritless.

Pineda points out the gun was never recovered and had not been "identified as to type by Nafanua, who was the only person who testified to seeing the weapon." Pineda argues the only evidence showing what kind of gun it was came from the firearms examiner, Peck, who testified the bullet extracted from Santoya's leg "most likely" had come from a semiautomatic firing .25-auto caliber cartridges. Pineda argues Peck acknowledged there did exist some revolvers that could fire .25-auto caliber ammunition.

---

[6] At the preliminary hearing, Nafanua initially testified he had not seen anyone with a gun, although he did remember telling the police he saw Pineda with a gun in his hand. Nafanua then again denied having seen Pineda with a gun, but subsequently reversed himself and testified the gunman had the same facial tattoos as Pineda. On cross-examination, Nafanua indicated he was only identifying Pineda as the gunman because Pineda was sitting at the defense table, but on redirect Nafanua reversed himself yet again: "Q. It seems [defense counsel] was asking you if earlier when you i.d.'d the defendant in court today as the person you saw in the bar on October 18, she was asking you, did you do that because you actually remembered him from that date or because you're just pointing to whoever you saw in a blue jail jumpsuit? [¶] Which is more accurate, that you remember him from that date or you just pointed to whoever was here? [¶] A. I remember him from that date." *At trial*, Nafanua confirmed that at the preliminary hearing he had identified Pineda's tattoos "as being the same facial tattoos as the person who was shooting," that he had truthfully identified the gunman to the police that night within minutes of the shooting, and that the person he identified that night as the gunman was "the same person" he had seen arguing with Santoya.

15

We are not persuaded. Although Peck testified there were .25-auto caliber revolvers, she also testified that so far as she could determine none of them possessed "the same general rifling characteristics as the bullet in this case."

The following colloquy occurred:

"Q. Now, you've offered the opinion that this was a semiautomatic pistol, correct?

"A. Most likely, yes. [¶] . . . [¶]

"Q. Isn't it true there are .25-caliber revolvers?

"A. *I believe there are a few out there. As far as ones manufactured that have the same general rifling characteristics as the bullet in this case, I did not locate any.*

"Q. Did you specifically look?

"A. I looked for any .25 auto caliber firearms.

"Q. Okay. And you say most likely. That means you can't be definite?

"A. Well, again, the database that I refer to is all of the firearms that are known to the FBI. So could there be additional firearms that are made that the FBI hasn't heard of? Probably. I don't know.

"Q. Okay. But the FBI's heard of .25-caliber revolvers; true?

"A. Yes. There are some, yes.

"The Court: Are they a common type of firearm? [¶] . . . [¶]

"The witness: I have never seen one in casework.

"Q. [By defense counsel]: Okay. In your 11 years or 8 years doing ballistics?

"A. Eight years, yes." (Italics added.)

When read in the context of this testimony, Peck's opinion that the gun "most likely" had been a semiautomatic was sufficient proof of this element of the offense.

d. *There was sufficient evidence Santoya suffered great bodily injury.*

Pineda contends there was insufficient evidence to sustain the great bodily injury enhancement as to Santoya because the evidence showed he had suffered merely a superficial wound, the bullet having "lodged just subcutaneously" in his thigh, far from "any of the major arteries in the leg," and it had been easily extracted.

16

"It is well settled that the determination of great bodily injury is essentially a question of fact, not of law. ' "Whether the harm resulting to the victim . . . constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' " (*People v. Escobar* (1992) 3 Cal.4th 740, 750.) Great bodily injury means a significant or substantial injury. (*Id.* at p. 746.) It does not require that the victim suffer " 'permanent,' 'prolonged,' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Id.* at p. 750.)

The following injuries have been held to constitute great bodily injury: bruising, scrapes, and abrasions accompanied by neck and vaginal pain (*People v. Escobar, supra,* 3 Cal.4th at p. 744, 749-750); "[a]brasions, lacerations, and bruising" (*People v. Jung* (1999) 71 Cal.App.4th 1036, 1042); swollen jaw, bruises to the head and neck, and sore ribs (*People v. Corona* (1989) 213 Cal.App.3d 589, 592); multiple contusions causing painful swelling and discoloration (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836).

Penetrating gunshot wounds have been found sufficient to sustain great bodily injury findings in situations akin to Santoya's injury. (See *People v. Wolcott* (1983) 34 Cal.3d 92, 106-108 [victim shot in calf, but bullet fragments lodged in arms; doctor removed one fragment but left others to work themselves out; victim lost little blood, required no sutures and went to work next day]; *People v. Mendias* (1993) 17 Cal.App.4th 195, 205-206 [victim shot in thigh treated at hospital, but bullet not removed]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 465 [bullet traversed victim's thigh, but no evidence wound was more than superficial because no evidence victim sought or received medical treatment].) Santoya testified he had to use a cane for a month and had a limp for a longer period of time.

There was sufficient evidence Santoya had suffered great bodily injury.

3. *Gang evidence and the Dodger Stadium incident were properly admitted.*

Pineda contends the trial court erred by admitting evidence of his gang affiliation and the Dodger Stadium altercation to show his motive for having committed the bar shooting. This claim is meritless.

a. *Background.*

While acknowledging there were no gang allegations (§ 186.22) in this case, the trial court ruled evidence about Pineda's membership in the Azusa 13 gang and about the Dodger Stadium incident was admissible to prove motive. The trial court concluded that, given Pineda's mistaken identity defense, the prosecution was entitled to show he would have had a motive for shooting Santoya. That is, evidence showing Pineda would have considered the otherwise innocuous encounter with Santoya, who was merely enforcing the bar's no-drinks-outside policy, as a serious act of disrespect and humiliation was relevant to explain Pineda's potentially lethal response.

As to the bar incident, the trial court reasoned that Pineda's "personal property was taken from him against his will by this large person, and what compounded that situation is the allegation that the defendant was disrespected in front of his friends, possible fellow gang members, including a couple of female companions. A gangster placed in that particular situation cannot allow that type of disrespect to go unpunished." The Dodger Stadium incident was "a clear example [of Pineda] being disrespected in front of his fellow gang members by a person of authority. He cannot allow that to go unpunished. That is why he put up the fight. That is why he made credible threats. When you disrespect a gang member in front of fellow gang members, that is a recipe for disaster that can often result in lethal consequences, which is identical to the People's theory outside that bar. . . . Even under [Evidence Code section] 352, the probative value . . . clearly outweighs the prejudicial effect. It is essential to the People's case because without this evidence . . . [i]t almost looks like a random act."

b. *Legal principles.*

The admission of gang evidence always carries a risk of prejudice. "When offered by the prosecution, we have condemned the introduction of evidence of gang

18

membership if only tangentially relevant, given its highly inflammatory impact."
(*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant's gang affiliation – including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.  [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239 [notwithstanding potential prejudicial effect of gang evidence, such evidence was admissible "when the very reason for the crime is gang related"]; *People v. Martin* (1994) 23 Cal.App.4th 76, 81 ["where evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial"].)

Evidence Code section 1101, subdivision (b) expressly allows evidence of uncharged crimes or other bad acts to be admitted "when relevant to prove some fact[ ]such as motive. . . ."  As Pineda acknowledges, we have previously explained that evidence a defendant had a common motive for committing the same type of misconduct is probative:  "Other crimes evidence is admissible to establish two different types or categories of motive evidence.  In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' [Citation.]  'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . .  [T]he motive is the cause, and both the charged and uncharged acts are effects.  *Both crimes are explainable as a result of the same motive.*' [Citation.]  [¶] California case law allows the admission of other crimes evidence to prove this second kind of motive." (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.)

On appeal, we review the trial court's rulings concerning the admissibility of the evidence for abuse of discretion.  (See, e.g., *People v. Thornton* (2007) 41 Cal.4th 391, 444-445)  A trial court has broad discretion to determine the relevance of evidence,

although it lacks discretion to admit irrelevant evidence.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1166-1167; *People v. Memory* (2010) 182 Cal.App.4th 835, 858.)

  c.  *Discussion.*

Pineda acknowledges these general principles, but argues they were inapplicable here because "the problem in this case is that the motive evidence was weak and the prejudice was strong."  But Pineda's arguments in this regard are unpersuasive.

Pineda asserts his case is similar to *People v. Memory, supra,* Cal.App.4th 835, which reversed convictions arising out of a bar parking lot fight because evidence was admitted likening the defendants' club to the Hell's Angels, an outlaw motorcycle gang whose members are committed to never backing down in a fight.  But the problem in *Memory* was that there was no evidence defendants' group, the Jus Brothers motorcycle club, was actually a criminal gang.[7]  Here, on the other hand, it was clear Pineda did belong to a criminal street gang.

Officer Wenrick testified he worked as as a "gang specialist in the gang unit at Azusa Police Department."  "[M]y assignment as a . . . gang specialist officer is to follow up on gang crimes, gather gang intelligence out in the field by contacting gang members."  Wenrick testified he has known Pineda for five or six years, and that Pineda was a member of the Barrio Azusa 13 gang.  Wenrick's opinion regarding Pineda's conduct during the Dodger Stadium incident was clearly based on Pineda's gang membership:  "[H]e shows tattoos.  He advises of his gang membership and then he makes the threats of his past criminal activity.  'You don't know who I am' is . . . done to show that he's not going to back down and to intimidate the security guard and hoping he'll back down just based on he's a gang member.  He's threatening.  He's done other

---

[7]  "There was no evidence the Jus Brothers was a criminal enterprise and the only evidence of a connection between the two groups was that some individual members of the Jus Brothers wore patches in support of the Hells Angels, usually in memory of a friend, members of the Jus Brothers attended functions put on by the Hells Angels, and the Jus Brothers Web site had a link to the Hells Angels Web site." (*People v. Memory, supra,* 182 Cal.App.4th at p. 861.)

crimes in the past. And it's done to intimidate and hopefully get the security guard to back down."

On cross-examination, Wenrick testified the gangs who were active in West Covina included the West Covina Mob, the West Covina 13, and Walnut Street. These gangs do not get along with Azusa 13, and if anyone from one of those gangs saw Pineda in the neighborhood they would "do something" to him.

The following colloquy occurred:

"Q. Now, when a gang member is challenged, you say that it's up to that gang member . . . to show they're down for the cause and not back down; true?

"A. Yes.

"Q. And to do something immediate when forced?

"A. To act upon it, yes.

"Q. Even if that person is bigger than them?

"A. Yes.

"Q. Because . . . even if they lose the fight, the fact that they took on that person upon challenge, that's the important part; true?

"A. Yes."

Defense counsel confirmed Wenrick had not been part of the original investigation into the bar shooting, and that he was not testifying as a gang expert to help prove up a gang enhancement. Rather, he was giving an expert opinion regarding the Azusa 13 gang and Pineda's membership in that gang.

On redirect, Wenrick testified that, given Pineda's membership in Azusa 13, "[i]t would be a natural response" for him to react violently "when confronted by a security guard." Then, on re-cross, defense counsel asked:

"Q. That would be true – the expectation to represent or to be down for the cause, that would be true of not just Azusa 13. That would be true of any gang member; true?

"A. Yes."

Hence, unlike the situation in *Memory*, it was clear in this case that Azusa 13 was the kind of criminal street gang that elicited a "never back down" attitude from its

21

members. Hence, the trial court did not abuse its discretion by admitting the gang evidence to explain Pineda's motive for what would otherwise have been an inexplicable shooting.[8]

d. *The Dodger Stadium incident was properly admitted*.

Pineda asserts the Dodger Stadium incident was too dissimilar to the bar shooting to be probative. He argues: "Those two incidents were very different from one another. No one . . . testified that appellant threatened Santoya during the argument. Appellant did not cause a commotion in the bar and was not ejected from the bar. His argument with the bouncer concerned a technicality relating to a drink. The only elements that the two incidents had in common were that appellant had words with a security person." We disagree. Pineda did cause a commotion at the bar and he was ejected; Santoya testified he told Pineda he would not be allowed back into the bar. There was evidence Pineda, Palencia and Velasco were surrounding Santoya, and that Pineda threatened Santoya with a gun. If the argument involved a "technicality," i.e., taking a drink outside the bar, then so did the Dodger Stadium incident, i.e., using obscene words and gestures during the ball game. In both instances Pineda reacted to a very mild assertion of authority in an outrageously aggressive manner.

Pineda argues that, because his ultimate altercation with Hubert occurred outside the stands, he could not have been motivated by a desire to save face since his friends could not have witnessed what was going on. But apart from the fact this is really speculation on Pineda's part, the evidence showed he had been motivated by the humiliation he suffered in front of his friends when Hubert made him leave the stands.

---

[8]     Pineda also complains very briefly about the evidence of a photograph "which shows appellant in a room with his twin brother, Mauricio, who is pointing and apparently has his finger on the trigger of what appears to be an assault weapon, and which invited the jury to find guilt by association . . . ." We have examined this photograph. Given the aggressive message constituted by Pineda's facial tattoos, particularly the one on his forehead saying, "Fuck Cops," we cannot see that a picture of his brother holding a gun could have been very prejudicial, particularly since Mauricio was never implicated in the bar shooting.

22

And during their subsequent altercation, Pineda gestured toward the stands and said, "You see who I hang out with up there. We're going to come get your ass. You're not safe." We do not see what difference it makes that his friends might not have been able to see or hear his altercation with Hubert.

Pineda asserts he "did not invoke his gang affiliation at Dodger Stadium. Looking at the evidence that was before the trial court at the time, appellant referred only to his 'homies,' and 'homies' is not synonymous with 'fellow gang members.' Even when the Dodger Stadium evidence was put on during trial, there was no testimony that appellant invoked his gang affiliation. Furthermore, there was no evidence that the people appellant was with were his confederates or anything other than just his friends." We disagree. The gang expert testified Pineda was implicitly invoking his gang affiliation by flaunting his tattoos, boasting of his prior arrests, and threatening that he and his friends would retaliate against Hubert. And while "homies" might, in some contexts, only refer to someone from the same neighborhood, it can also mean "fellow gang members."

Pineda also argues the evidence did not show he invoked his gang affiliation during the bar incident. We again disagree. Santoya testified he told police Pineda had "thrown out" that he was "from Azusa." Given the extremely large "Azusa" tattoo on the front of Pineda's neck, the jury reasonably concluded this was intended to be a gang reference; common sense indicates Pineda was not purporting to represent the Azusa Chamber of Commerce.

The trial court did not abuse its discretion by admitting the Dodger Stadium incident into evidence.[9]

---

[9] Pineda also argues, in passing, that the trial court should have precluded the gang expert from testifying because, under sections 1054.1 and 1054.7 "there was a lack of the required 30-day notice that a gang expert would be called by the prosecution and a lack of discovery of appellant as a gang member." However, "prohibiting the testimony of a witness is not an appropriate discovery sanction in a criminal case absent a showing of significant prejudice and of willful conduct." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1747.) Here there was neither. Although Pineda complained about an alleged lack of notice, he never asked for a continuance to prepare for the gang expert's testimony, and he acknowledged he was "not alleging any sort of prosecutorial misconduct here."

4. *Any error in defining "semiautomatic firearm" for the jury was harmless.*

Pineda contends his convictions must be reversed because the trial court erred by failing to instruct the jury on the meaning of "semiautomatic firearm." We disagree.

a. *Background*.

During discussions with counsel about proposed jury instructions, the trial court announced it was going to give CALCRIM No. 875 on the elements of assault with a semiautomatic firearm (§ 245, subd. (b)). But the court said it had not included that instruction's definition of "semiautomatic" because "I will define the term firearm in the instructions for the firearm use allegation."[10] However, the enhancement instruction merely said: "A firearm is any device designed to be used as a weapon from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion." The missing part of CALCRIM No. 875 would have said: "A semiautomatic pistol extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."

b. *Legal principles.*

As we have pointed out, " 'an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1210; see *Neder v. United States* (1999) 527 U.S. 1, 9, 18 [144 L.Ed.2d 35], [applying harmless error standard to instructional error omitting element of an offense]; *People v. Avila* (1995) 35 Cal.App.4th 642, 660-662 [failure to instruct on asportation element of aggravated kidnapping was harmless error]; see also *People v. Catlin* (2001) 26 Cal.4th 81, 154 [even if instruction had omitted element of special circumstance

---

The trial court ruled Pineda "was put on notice that gang evidence was a possibility in this case, [just] not necessarily exactly what witness would testify as to such gang evidence."

[10]    Hence, the jury was instructed Pineda had been charged in counts 3 and 4 with assault with a semiautomatic firearm, and told: "The term firearm is defined in another instruction to which you should refer."

24

charge, under the evidence presented any error would be harmless beyond reasonable doubt].)

An appellate court will examine the jury instructions as a whole, along with the attorneys' closing arguments to the jury, to determine if the instructions sufficiently conveyed the correct legal principles. (See *People v. Kelly* (1992) 1 Cal.4th 495, 524-527 [although trial court erroneously instructed jury it was legally possible to rape a dead body, it was not reasonably likely jury misunderstood correct law regarding felony murder and rape special circumstances given remaining instructions and attorneys' jury argument]; see also *People v. Visciotti* (1992) 2 Cal.4th 1, 58-59 [improper intent instructions were harmless error where closing arguments made jury aware specific intent to kill was element of attempted murder].)

### c. *Discussion*.

Assuming arguendo the trial court should have defined "semiautomatic firearm" for the jury, although Pineda has cited no specific authority to that effect, we conclude the error was harmless because this case is governed by *People v. Flood* (1998) 18 Cal.4th 470. That case involved a conviction for violating Vehicle Code section 2800.3 (unsafe driving while fleeing peace officer resulting in serious bodily injury), where the trial court failed to define "peace officer."[11]

*Flood* held the error was not prejudicial whether measured by the state (*Watson*) or the federal (*Chapman*) harmless error standard.[12] "Reviewing the trial court's

---

[11]    "An individual violates [Vehical Code section 2800.3] whenever his or her 'willful flight or attempt to elude a pursuing peace officer in violation of Section 2800.1 proximately causes death or serious bodily injury to any person . . . .' One element of a violation of section 2800.1 is that the pursuing peace officer's motor vehicle 'is operated by a peace officer, as defined in [Penal Code sections 830 through 832.9], and that peace officer is wearing a distinctive uniform.' (§ 2800.1, subd. (a)(4).) Penal Code section 830.1, subdivision (a), defines the term 'peace officer' to include 'any police officer, employed in that capacity and appointed by the chief of police . . . of a city.' " (*People v. Flood, supra,* 18 Cal.4th at p. 482.)

[12]    *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].

constitutional error under the *Watson* standard, we find no reasonable probability that the outcome of defendant's trial would have been different had the trial court properly instructed the jury to determine whether Officers Bridgeman and Gurney were peace officers. The prosecution presented unremarkable and uncontradicted evidence that they were employed as police officers by the City of Richmond. In addition, throughout the trial these officers and other witnesses corroborated that evidence in the course of testifying regarding other issues. At no point during the trial did defendant contest or even refer to the peace officer component of the distinctive uniform element of the crime." (*People v. Flood, supra,* 18 Cal.4th at p. 490.) The same result was reached under *Chapman*: "One situation in which instructional error removing an element of the crime from the jury's consideration has been deemed harmless is where the defendant concedes or admits that element. [Citations.] . . . Defendant never referred to this element of the crime during the trial and did not argue to the jury that the prosecution had failed to prove this element beyond a reasonable doubt; indeed, he did not ask that the issue even be considered by the jury." (*People v. Flood,* at pp. 504-505, footnotes omitted.)

Pineda argues *Flood* is inapposite because there, the missing "peace officer" definition was merely "a peripheral element of the offense," whereas here, "[t]here was nothing peripheral about whether the firearm . . . was a semiautomatic firearm; that was at the heart of the charged offense." Not so. In this respect Pineda's case is exactly the same as *Flood*: they both involve undisputed evidence regarding a peripheral element. Pineda's defense was that it did not matter what kind of gun had been used in the bar shooting because he was not the gunman. During closing argument defense counsel never once disputed the "semiautomatic" element of the assault charges, merely arguing that if the jury was persuaded Pineda had been the gunman, it then just had to decide if Pineda were guilty of attempted murder or assault.[13]

---

[13] Defense argued: "[T]here may be some of you that think [Pineda] is the trigger puller. He is the guy that shot the gun. What you then have to decide is, is it attempted murder or is it assault with a semiautomatic firearm?" "If you believe that he's the

26

Pineda argues he was prejudiced "because the jurors had no basis for deciding what a semiautomatic firearm was except for the testimony of [Peck] and the related exhibit,[14] which may not have been correct; or the jurors may not have given that aspect of the charge any thought." But Peck's explanation was obviously "correct." As Pineda acknowledges, the missing definition would have said: "A semiautomatic pistol extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger." (CALCRIM No. 875.) Peck's testimony explained *both* parts of this definition.[15] And while Pineda tries to dismiss Peck's explanation by arguing "the jury was instructed that it need not accept the expert's opinions as true or correct," this aspect of her testimony did not really constitute an expert "opinion." Peck's expert opinion was that, based on the four cartridge casings and the bullet taken from Santoya's leg, the gun had most likely been a semiautomatic. Her explanation of how a semiautomatic firearm operates was simply a statement of scientific fact. Pineda does not assert there was anything inaccurate in her explanation.

---

gunman, there is certainly not evidence by proof beyond a reasonable doubt he did it with an intent to kill. And certainly not cold, calculated, premeditated murder."

[14] The People's exhibit No. 23 was a drawing entitled, "Semi-Automatic Pistol," with all the parts labeled, including a "magazine (detachable)."

[15] Peck testified: "Now, in order to get a cartridge from the magazine into the chamber of the pistol to fire it, the shooter would pull the slide, which is the top most component of the pistol. The shooter would pull the slide to the rear. *And that slide is under heavy spring tension. So, when it is released, it will automatically return forward on its own and, when it does so, it will push the cartridge at the very top of the magazine into the chamber of the pistol, ready to fire.* The shooter would then pull the trigger." "And that cartridge case slams back against the breach face and forces the slide to the rear as well. *The cartridge case is then automatically ejected from the pistol.* And now all those gases have escaped and the pressures have gone down and that slide, because it is still under spring tension, will again return forward on its own. And, when it does so, it will push the next cartridge in the top of the magazine, into the chamber of the pistol, ready to fire. And this type of pistol will fire one cartridge with each pull of the trigger." (Italics added.)

27

Hence, any error in failing to instruct the jury on the definition contained in CALCRIM No. 875 was harmless.

5. *Section 245, subdivision (b) does not violate equal protection.*

Pineda contends his convictions must be reversed because section 245, subdivision (b), the statute prohibiting assault with a semiautomatic firearm, violates equal protection. This claim is meritless.

a. *Legal principles.*

"It is a fundamental principle that, '[t]o succeed on [a] claim under the equal protection clause, [a defendant] first must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.' [Citations.] 'In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment . . . we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. [Citations.] Classifications based on race or national origin . . . and classifications affecting fundamental rights . . . are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. [Citations.]' [Citations.]" (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836-837.)

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1199.) "Under the equal protection clause, we do not inquire 'whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' [Citations.]" (*Id.* at pp. 1199-1200.) "If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold." (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

28

b. *Discussion*.

Pineda contends section 245, subdivision (b) violates equal protection because it carries a punishment greater than that for violating section 245, subdivision (a)(2), the crime of simple assault with a firearm. He argues: "[A] semiautomatic handgun fires one cartridge with each pull of the trigger. But that is also true of double action . . . revolvers, which were the standard-issue sidearm of countless police departments for many decades. Most modern revolvers are traditional double-action. . . . While it is true that . . . a semiautomatic handgun extracts a fired cartridge with each pull of the trigger, that benefits law enforcement in many instances by allowing recovery of evidence, as happened in this case. [¶] There is no compelling state interest in treating a person who assaults someone with a double action . . . revolver much more leniently than a person who assaults the same person with a semiautomatic handgun under the same circumstances, causing the same injury . . . ."

Citing *People v. Olivas* (1976) 17 Cal.3d 236, Pineda asserts we must apply the strict scrutiny test in this situation: "This classification, affecting the length of a person's prison sentence, must be examined under the 'compelling state interest' test, because it involves a fundamental right – the right to liberty." But this argument ignores the Supreme Court's subsequent opinion in *People v. Wilkinson, supra,* 33 Cal.4th at pp. 837-838, which said: "The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to 'personal liberty' of the affected individuals. Nevertheless, *Olivas* properly has not been read so broadly. . . . [A] broad reading of *Olivas,* as advocated by defendant here, would 'intrude[ ] too heavily on the police power and the Legislature's prerogative to set criminal justice policy.' " Hence, our Supreme Court "has subsequently rejected the argument that the *Olivas* decision means that strict scrutiny is applied 'whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to "personal liberty"

29

of the affected individuals.' [Citation.] Instead, the Supreme Court has said that the rational basis test applies to equal protection challenges based on sentencing disparities." (*People v. Ward* (2008) 167 Cal.App.4th 252, 258.)

In this case, there is no reason not to apply the general rule that persons convicted of *different* crimes are not similarly situated for equal protection purposes. (See *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1565.) "In *Olivas*, the court reviewed a statutory scheme in which youthful misdemeanants were punished more severely than adults who committed the same crime. The court applied the strict scrutiny test, and found the classification constitutionally infirm. [¶] But the fact that liberty interests are involved in criminal punishment does not mean that every criminal law imposing punishment is subject to strict scrutiny. [Citations.] '[I]t is one thing to hold, as did *Olivas*, that persons convicted of the *same crime* cannot be treated differently. It is quite another to hold that persons convicted of *different crimes* must be treated equally. The latter are not similarly situated for equal protection purposes.' [Citation.]" (*People v. Kilborn* (1996) 41 Cal.App.4th 1325, 1330.)

As the Attorney General points out, "the Legislature could reasonably find that a semiautomatic firearm is potentially more lethal than a non-automatic firearm. . . . In light of this difference, [Pineda] is not similarly situated to a defendant who uses a non-automatic firearm." Pineda argues the Attorney General is "merely speculat[ing], without citation to authority, about what the Legislature could reasonably find with respect to semiautomatic firearms." But Pineda himself has not cited any evidence from the record discussing .25-caliber double-action revolvers. In any event, surely the Legislature could have reasonably concluded semiautomatic handguns are inherently more lethal than revolvers because, by virtue of their magazines, they are capable of holding more bullets than revolvers, and thus their potential firepower is much greater.

There was no equal protection violation.

6. *There was no cumulative error.*

Pineda contends his convictions must be reversed for cumulative error. However, "[b]ecause we identified only one harmless error [the trial court's failure to define

30

semiautomatic firearm], the claim of cumulative error is without merit." (*People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6 ["Since we have found only one error properly preserved for appeal, we need not address appellant's contention that cumulative error at trial requires reversal."].)

7. *Sentencing errors.*

Pineda contends the trial court made a series of sentencing errors. With one exception, we find these claims to be meritless.

a. *Background.*

As part of imposing a total term of 44 years 4 months,[16] the trial court sentenced Pineda as follows:

"The court selects as base term the high term of nine years on count 3. This is a violation of Penal Code section 245, subdivision (b). The court selects high term for the following reasons: The crime involved great violence, great bodily harm, a threat of bodily harm and other acts disclosing a high degree of cruelty, viciousness, and callousness. The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, which the court can consider [as] factors relating to the defendant himself. He has engaged in violent conduct that indicates a serious danger to society. His prior conviction[s] as an adult are numerous and increasing in seriousness. The defendant was on probation at the time the present offense was committed, and his prior performance on probation is certainly unsatisfactory.

"In terms of mitigation, I can find [no factors] mitigating the crime or mitigating the offense for any basis relating to the defendant. So he has certainly earned the high term as indicated.

"That high term must be doubled pursuant to [the Three Strikes law] for a total of 18 years.

---

[16]     This included a two-year sentence for violating section 422 (making criminal threats), a conviction arising out of a separate prosecution based on the Dodger Stadium incident.

"In addition and consecutive to that term, the court orders the defendant serve an additional ten years pursuant to 12022.5, subdivision (a)(1). Specifically because the defendant removed [*sic*] a loaded firearm and fired not only at his intended target but also in the direction of unintended targets, striking both intended and unintended targets. That was an extremely dangerous move on his behalf and it threatened the life of not only the person he had a quarrel with but also other innocent individuals in the area. So he has earned the high term on the gun use allegation." The trial court added a consecutive five-year term under section 667, subdivision (a) (prior serious felony conviction).

The trial court then imposed a consecutive term for the second assault conviction: "Subordinate to that term, the court will select one-third of the six-year mid term, which is two years. This is pertaining to count 4, a violation of Penal Code section 245, subdivision (b). That two-year [term] must be doubled pursuant to [the Three Strikes law] for a total of four years. [¶] In addition and consecutive to that term, the court will select one-third of the four-year mid term which is 1 year 4 months pursuant to 12022.5, subdivision (a), . . . the gun use allegation."

Finally, the trial court added two consecutive three-year terms (on count 3 and count 4, respectively) for the great bodily injury enhancements.

b. *Upper terms for count 3 and attached firearm enhancement were properly imposed.*

Pineda contends that, by imposing an upper term on count 3 and a consecutive upper term on the related firearm use enhancement, the trial court violated *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856], as well as the rule against dual use of sentencing factors. This claim is meritless.

Pineda contends the trial court violated *Cunningham* because the jury did not make the required predicate factual determinations. However, "[i]n March 2007, the California Legislature amended Penal Code section 1170, subdivision (b) of the determinate sentencing law [DSL] to read: 'When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court.' [Citation.] Several months later in

32

July 2007 in *People v. Sandoval* (2007) 41 Cal.4th 825 . . . , our Supreme Court judicially adopted the amendment to section 1170 for retroactive application and further held 'the prohibition on ex post facto laws applies only to statutory enactments, not to judicial decisions' in upholding a trial court's authority to impose an upper term sentence based on facts found by the court. [Citations.] In light of section 1170 as construed by *Sandoval*, the trial court's imposition of the upper-term sentence in 2010, after the amendment to section 1170 and publication of *Sandoval* in 2007, is lawful." (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 278-279; see also *People v. Jones* (2009) 178 Cal.App.4th 853, 866-867 ["In *Sandoval* . . . our Supreme Court held it is constitutionally appropriate to apply the amended version of the DSL in all sentencing proceedings conducted after the effective date of the amendments, regardless of whether the offense was committed prior to the effective date of the amendments."].)

As for Pineda's contention the trial court erred by using the same factor to impose both an upper term on the base count and an upper term on the section 12022.5 enhancement, this is incorrect. (See *People v. Moberly* (2009) 176 Cal.App.4th 1191, 1198 ["the dual use of a fact or facts to aggravate both a base term and the sentence on an enhancement is not prohibited"].) Pineda's reliance on dicta in *People v. Velasquez* (2007) 152 Cal.App.4th 1503, in this context is misplaced. Pineda's reliance on *People v. Forster* (1994) 29 Cal.App.4th 1746, 1758, is also misplaced because there, the issue was use of the same sentencing factor to impose both an enhancement and an upper term on the substantive count. The issue here is using the same factor to impose an upper term on the substantive count and an upper term on the enhancement.

c. *Firearm use enhancement on count 4 was properly imposed*.

Pineda contends the firearm use enhancement (§ 12022.5) imposed in connection with count 4 must be stricken because it was not alleged in the information. This claim is meritless.

Section 1170.1, subdivision (e) provides: "All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." Due process requires that a defendant be informed of

enhancements alleged against him. (*People v. Hernandez* (1988) 46 Cal.3d 194, 208, disapproved on other grounds in *People v. King* (1993) 5 Cal.4th 59, 78, fn. 5.) Consequently, if the charging document entirely fails to plead an enhancement, the defendant receives no notice the prosecution is seeking an enhanced sentence and due process is violated.

However, if " 'the information puts the defendant on notice that a sentence enhancement will be sought, and further notifies him of the facts supporting the alleged enhancement, modification of the judgment for a misstatement of the underlying enhancement statute is required only *where the defendant has been misled to his prejudice.*' " (*People v. Thomas* (1987) 43 Cal.3d 818, 830-831.) That is because "the language of the pleading itself – irrespective of the statutory specification – should have alerted the defendant he faced the increased enhancement term." (*Id.* at p. 831; see also *People v. Wandick* (1991) 227 Cal.App.3d 918, 926-927 [where defendant notified four-year enhancement would be sought, because he was personally armed with a gun, he "cannot say that preparation of his defense would have been different if the information had cited section 12022, subdivision (a) rather than (b)."].)

Here, it is clear from the information Pineda was being charged with having *personally* used a firearm to commit the assaults against *both* Santoya and Nafanua. The count 2 allegation arising from the same bar shooting incident, i.e., the attempted murder of Nafanua, did charge an enhancement for personal use of a firearm. Therefore, imposition of a firearm use enhancement on both count 3 and count 4 did not prejudice Pineda, although the information failed to charge the count 4 enhancement, because his defense to both counts and allegations was the same.

d. *Trial court improperly imposed a full-term consecutive enhancement on the great bodily injury enhancement attached to count 4.*

Pineda contends, and the Attorney General properly concedes, that the trial court erred by sentencing him to a full-term three-year great bodily injury enhancement on count 4 because the punishment on that count was consecutive to the punishment on count 3 and, therefore, the proper enhancement was only one-third the midterm. As

34

section 1170.1, subdivision (a) provides, in pertinent part: "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, *and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses*." (Italics added.)

Hence, the consecutive enhancement term on count 4 should have been for only one year. We will order the judgment modified to reflect this correction.

        e. *Trial court properly imposed a consecutive term on count 4.*

Pineda contends the trial court improperly imposed a consecutive term on his count 4 conviction (for assault with a semiautomatic firearm on Nafanua), either because a consecutive term was unwarranted or because the court was unaware it had discretion to impose a concurrent term. This claim is meritless.

Section 669 provides in pertinent part: "When a person is convicted of two or more crimes, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same judge or by different judges, the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively."

"It is well established that a trial court has discretion to determine whether several sentences are to run concurrently or consecutively. [Citations.] In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. [Citation.] Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered." (*People v. Bradford* (1976) 17 Cal.3d 8, 20.) "[I]n the absence of a clear showing that its sentencing decision was arbitrary or irrational, a trial court should be presumed to have acted to achieve legitimate sentencing objectives and, accordingly, its discretionary determination to impose consecutive

35

sentences ought not be set aside on review." (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

Pineda argues it is unclear why the trial court declined to impose concurrent terms when it had discretion to do so since the two offenses "were committed on the same occasion and arose from the same set of operative facts." There is no indication in the record the trial court did not understand it had discretion to impose a concurrent sentence on count 4. We agree with the Attorney General that the trial court's comments at sentencing indicated it intended to impose a very severe sentence for Pineda's egregious crimes. The trial court noted eight or more aggravating factors and found there were no mitigating factors. The court also noted that just a few weeks before committing the shootings, Pineda had been granted probation after pleading guilty to a felony arising out of the Dodger Stadium incident.

Although the trial court should have given a statement of reasons for imposing this consecutive term, no remand is necessary if it is not reasonably probable the court would have chosen a lesser sentence. (See *People v. Heishman* (1988) 45 Cal.3d 147, 201 [defendant not prejudiced by judge's failure to state reasons for denying modification of verdict imposing death penalty where "evidence that the aggravating circumstances outweighed the mitigating circumstances was so overwhelming that there is no reasonable possibility that a statement of reasons would have altered the trial judge's conclusion or revealed reversible error"]; *People v. May* (1990) 221 Cal.App.3d 836, 839-840 ["We see no likelihood that requiring the trial court to state reasons for the consecutive sentence would reveal reversible error, because the record clearly shows at least one factor supporting that sentencing choice. . . . [¶] Likewise, there is no reasonable possibility the sentencing court would alter its conclusion if required to state reasons."].)

Here, it is not reasonably probable the trial court would have imposed a lesser sentence if asked to state its reasons.

36

　　　　　f.　*Pineda's sentence on count 3 did not constitute cruel and unusual punishment.*

Pineda contends his sentence of 31 years on count 3 amounted to cruel and unusual punishment under both the California and the United States Constitutions. This claim is meritless.

The length of this sentence alone does not warrant relief. (See *Harmelin v. Michigan* (1991) 501 U.S. 957 [115 L.Ed.2d 836] [mandatory LWOP sentence for possessing more than 650 grams of cocaine did not violate Eighth Amendment].)

Pineda has not demonstrated his sentence was disproportionate to his crime or to his individual culpability, or excessive when compared to the punishment imposed for more serious offenses. (See *People v. Dillon* (1983) 34 Cal.3d 441, 477-482; *In re Lynch* (1972) 8 Cal.3d 410, 423-424.) Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. [Citations.] While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17, the validity of enactments will not be questioned 'unless their unconstitutionality clearly, positively, and unmistakably appears.' [Citations.]" (*People v. Wingo* (1975) 14 Cal.3d 169, 174, fn. omitted.)

In *Dillon*, an immature 17-year-old killed a man who had been guarding a marijuana crop that defendant and his friends were trying to steal; as the victim advanced on him with a shotgun, Dillon fired his .22-caliber rifle out of fear and panic. (*People v. Dillon, supra*, 34 Cal.3d at p. 487.) Pineda argues his case can be reasonably compared to *Dillon* because he was only 21 when the incident occurred, "there was evidence of provocation" because Santoya humiliated Pineda in front of his friends "knowing that [Pineda] had a razor-shaved head and face and head tattoos," and, since Pineda had been drinking that night, "it is reasonable to assume [he] was . . . feeling the effects of the

37

liquor, which . . . may well have clouded his judgment." But these suggested similarities are entirely unpersuasive and there is no comparison to be made between the two cases. Dillon thought he was about to be killed when he fired on the victim in fear and panic. The evidence here showed Pineda carefully walked away from the much-larger Santoya, to insure Santoya would not disarm him, before drawing his weapon and firing from some distance away.

Pineda argues the punishment on count 3 was grossly disproportionate when compared with the punishment for other, more serious California crimes. But the offenses he cites are all obviously distinguishable: stabbing a victim in the leg and inflicting great bodily injury; committing mayhem with a knife and inflicting great bodily injury; and committing gross vehicular manslaughter.

Pineda's sentence on count 3 did not constitute cruel and unusual punishment.[17]

## DISPOSITION

The judgment is affirmed as modified. The sentence on the count 4 great bodily injury enhancement must be reduced from three years to one year. In all other respects, the judgment stands. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.                                    ALDRICH, J.

---

[17] In his opening brief, Pineda also claimed the trial court violated the rule against multiple punishment (§ 654) by imposing enhancements for both firearm use and great bodily injury on counts 3 and 4. However, in his reply brief, Pineda has withdrawn this claim.